**Larry CHAPMAN, et al., Plaintiffs,**

v.

**John C. NICHOLSON, et al.,
Defendants.**

**Civ. A. No. CV82–PT–1879–J.**

United States District Court,
N.D. Alabama,
Jasper Division.

Feb. 13, 1984.

Hoyt Elliott, Hoyt Elliott, Jr., Jasper, Ala., for plaintiffs.

Morris W. Savage, Jasper, Ala., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

PROPST, District Judge.

This voter dilution case came before the court for trial in Jasper, Alabama on December 14, 1983. Plaintiffs seek a determination that the City of Jasper's at-large system of electing city officials discriminates against black persons and as such violates Section 2 of the Voting Rights Act of 1965, as amended in 1982, 42 U.S.C. § 1973.[1]

---

1. Plaintiffs have made no effort to offer direct evidence of discriminatory purpose as required by the Fourteenth and Fifteenth Amendments. *Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64

L.Ed.2d 47 (1980). Neither is the type "dilution" addressed by *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), applicable.

## BACKGROUND OF SECTION 2 AMENDMENT

Section 2 as amended reads:

§ 1973 Denial or abridgement of right to vote on account of race or color through voting qualifications or prerequisites; establishment of violation

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which *results* in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973(b)(f)(2) of this title, as provided in subsection (b) of this section.

(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

(As amended Pub.L. 97–205, § 3, June 29, 1982, 96 Stat. 134.)

42 U.S.C.A. § 1973 (Supp.1983) (emphasis added).

Section 2 was amended in an attempt to nullify the practical effect of the Supreme Court's decision in *City of Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980). *Bolden* held that state actions which are, on their face, racially neutral constitute a violation of the Fourteenth and Fifteenth Amendments only if motivated by a discriminatory purpose. In other words, *intent* to discriminate is a necessary element of a cause of action based upon the Fourteenth and Fifteenth Amendments. *See Bolden,* 446 U.S. at 62–65, 100 S.Ct. at 1497–1498. The Court held that the prohibitions of Section 2 of the Voting Rights Act (as originally enacted) were no broader than those of the Fifteenth Amendment, *Bolden,* 442 U.S. at 60–61, 100 S.Ct. at 1495–1496, and therefore an intent to discriminate was also a necessary element of a cause of action founded on the Voting Rights Act.

In the early 1970's a line of circuit court cases developed a "results" test for determining voting dilution violations. Under this test, a violation could be proven either by a showing of (1) intentional or purposeful discrimination or (2) by a showing that the statute or state action in question resulted in a denial to minorities of equal access to the electoral process. *See Zimmer v. McKeithen,* 485 F.2d 1297, 1305 (5th Cir.1973). The Fifth Circuit in *Zimmer* articulated several factors to be considered in an attempt to clarify what constituted a discriminatory "result" in voter dilution cases. Impermissible vote dilution was established under the "results" test by proof of the existence of an aggregate of these factors. *Zimmer,* 485 F.2d at 1305.

The Fifth Circuit supported its widely followed "result" test with language from the Supreme Court opinions in *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), and *Whitcomb v. Chavis,* 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971). Both of these cases appeared to indicate that a violation could be established without proof of intent to discriminate. *See Nevett v. Sides,* 571 F.2d 209, 232 (5th Cir.1978) (Wisdom, Circuit Judge, specially concurring) ("In [*White* and *Whitcomb*] . . . the Supreme Court did not require proof of a legislative intent to discriminate"). Later in the decade, however, the Supreme Court decisions in *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), and *Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977), cast doubt on

the premise that a violation could be established without proof of intent. The Fifth Circuit, recognizing the apparent change in the elements required to establish such violations, held in *Nevett v. Sides*, 571 F.2d 209, 225 (1978), that a finding of impermissible vote dilution under the *Zimmer* factors raised an *inference* of intentional discrimination, thus satisfying the perceived requirement of a finding of intent.

In the 1980 decision of *City of Mobile v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), the Supreme Court clearly held that a finding of intentional discrimination was required to find a constitutional violation in a vote dilution case. The Court, in addition, held that the *Zimmer* criteria were "most assuredly insufficient to prove an unconstitutionally discriminatory purpose in [a voter dilution] case." *Bolden*, 446 U.S. at 73, 100 S.Ct. at 1503.

■ Keeping this background in mind, it becomes apparent from both the language of the 1982 amendment to the Voting Rights Act and the legislative history surrounding its passage that Congress intended to allow a cause of action based on Section 2 of the Act (42 U.S.C. § 1973) without the requirement of a finding of purposeful or intentional discrimination. Although *Bolden* remains the law with regard to *constitutional* violations, the 1982 amendment to the Voting Rights Act clearly broadens the prohibitions of Section 2 to allow a cause of action based on state laws or practices which *result* in discrimination in voting. For the reasons discussed below, this court finds that the practical effect of the 1982 amendment is to return the court's inquiry in a statutorily-based vote dilution case to the *Zimmer* criteria as they existed prior to the *Washington v. Davis* and *Arlington Heights* decisions.

The Congressional intent to return to the *Zimmer* criteria is perhaps most clearly displayed by the language of § 2(b), 42 U.S.C. § 1973(b). Section 2(b) states in part:

A violation of subsection (a) of this section is established if, *based on the totality of circumstances*, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of [a protected minority] *in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.* The extent to which members of a protected class have been elected to office ... is one circumstance which may be considered...."

42 U.S.C. § 1973(b) (emphasis added). This subsection is a general expression of the more specific *Zimmer* factors:

"[W]here a minority can demonstrate a lack of access to the process of slating candidates, the unresponsiveness of legislators to their particularized interests, a tenuous state policy underlying the preference for multi-member or at-large districting, or that the existence of past discrimination in general precludes the effective participation in the election system, a strong case is made. Such proof is enhanced by a showing of the existence of large districts, majority vote requirements, anti single shot voting provisions and the lack of provision for at-large candidates running from particular geographical subdistricts. The fact of dilution is established upon proof of the existence of an aggregate of these factors. The Supreme Court's recent pronouncement in *White v. Regester, supra*, demonstrates, however, that all these factors need not be proved in order to obtain relief."

*Zimmer*, 485 F.2d at 1305. The most striking similarities between the amended section 2(b) and the *Zimmer* criteria are (1) the emphasis on the availability of the political *processes* to minorities found in both, and (2) the emphasis on the "totality of circumstances" (§ 2(b) of the Voting Rights Act), and the "aggregate of factors" of the *Zimmer* test.

In addition to the obvious similarities between the language of the statute and the *Zimmer* test, the legislative history surrounding the passage of the 1982 amendment to the Voting Rights Act makes it

clear that Congress intended, by enacting the amendment, to return to the *Zimmer* "results" test. The report of the Senate Judiciary Committee states:

The proposed amendment of Section 2 of the Voting Rights Act is designed to restore the legal standard that governed voting discrimination cases prior to the Supreme Court's decision in *Bolden.* In pre-*Bolden* cases plaintiffs could prevail by showing that a challenged election law or procedure in the context of the total circumstances of the local electoral process, had the result of denying a racial or language minority an equal chance to participate in the electoral process. Under this results test, it was not necessary to demonstrate that the challenged election law or procedure was designed or maintained for a discriminatory purpose.

.　　.　　.　　.　　.

First, prior to 1978, the lower courts applied a results test and did not require a showing of discriminatory intent in voting dilution cases. The seminal court of appeals decision was *Zimmer v. McKeithen.* In *Zimmer*, the Fifth Circuit, *en banc* made clear that dilution cases could be maintained on either an intent or a results basis.... In *Zimmer*, the court articulated the factors that the Supreme Court had used in *White* to appraise the impact of the multi-member districts. The court concluded that the fact of dilution is established upon proof of the existence of an aggregate of these factors. The Supreme Court's pronouncement in *White v. Regester, supra*, demonstrates, however, that not every one of these factors needs to be proved in order to obtain relief.

*Zimmer* was subsequently relied upon in the vast majority of nearly two dozen reported dilution cases.

.　　.　　.　　.　　.

Thus, it is clear that until the Fifth Circuit in 1978 attempted to reconcile *Washington v. Davis* with *White* and *Whitcomb*, the prevailing standard in

voting dilution was the "results" test and intent was not a prerequisite.

.　　.　　.　　.　　.

The amendment to the language of Section 2 is designed to make clear that plaintiffs need not prove a discriminatory purpose in the adoption or maintenance of the challenged system [or] practice in order to establish a violation. Plaintiffs must either prove such intent, or alternatively, must show that the challenged system or practice, in the context of all the circumstances in the jurisdiction in question, results in minorities being denied equal access to the political process.

.　　.　　.　　.　　.

The "results" standard is meant to restore the pre-*Mobile* legal standard which governed cases challenging election systems or practices as an illegal dilution of the minority vote. Specifically, subsection (b) embodies the test laid down by the Supreme Court in *White.*

If the plaintiff proceeds under the "results test," then the court would assess the impact of the challenged structure or practice on the basis of objective factors, rather than making a determination about the motivations which lay behind its adoption or maintenance.

Senate Rep. No. 97–417, 97th Cong., 2d Sess., *reprinted in* 1982 U.S.Code Cong. & Ad.News 177, 193, 200–201, 205 (footnotes omitted).

▆▆▆ Although there are no reported Eleventh Circuit cases interpreting the 1982 Amendment, it is apparent from this legislative history that Congress intended its 1982 amendment to section 2 to apply the *Zimmer* "results" test to vote dilution cases brought under the Voting Rights Act. *Zimmer* lists four "primary" or "principal" factors as the criteria which should be considered in determining vote dilution. Positive findings with regard to these factors provide strong evidence that minorities are denied an equal opportunity to participate in the political process. These "principal" factors are:

1) A lack of minority access to the process of slating candidates;

2) Unresponsiveness by legislators to the minority's particularized interests;

3) A tenuous state policy underlying the preference for multi-member or at-large districting; and,

4) The existence of past discrimination which in general precludes effective minority participation in the election system.

*See Zimmer* at 1305. These "primary" factors are "enhanced" by findings with respect to several "extra" factors. These factors are not so directly related to the denial to minorities of access to the political system as are the "primary" factors, but proof of the "extra" factors does tend to buttress the findings made with respect to the "primary" factors. These "extra" factors are:

a) The existence of large districts;

b) The existence of anti-single shot voting provisions;

c) The existence of majority vote requirements; and,

d) The lack of provision for at-large candidates running from particular geographical subdistricts.

*See Zimmer* at 1305. In addition to these *Zimmer* factors, the Senate Judiciary Committee Report listed several "typical" factors which would need to be proven in a vote dilution case. These "typical" factors are essentially those enumerated in *Zimmer*, but the Report adds the following factors:

1) The existence of racially polarized voting in the political subdivision;

2) Political campaigns characterized by overt or subtle racial appeals; and,

3) Consistent failure of minority candidates for public office.

*See* Sen.Rep. 97–417 at 28–29, 1982 U.S. Code Cong. at 206–207. Although these factors do not fit neatly into the *Zimmer* analysis as either "primary" or "enhancing" factors, they should be addressed and given weight when all the factors are considered "in the totality of the circumstances." 42 U.S.C. § 1973(b).

The Fifth Circuit gave some guidance to the district courts regarding the application of the *Zimmer* factors in *Nevett v. Sides*, 571 F.2d 209, 226 (1978). The court stated that:

> *Zimmer* establishes certain subissues, the criteria, that a trial court must address before it can reach the ultimate issue of dilution. In essence, the criteria are directions that tell the trial court what type of circumstantial evidence can make out a dilution case. The court must address each subissue, if relevant to the particular case at hand,[23] and determine whether the evidence under that criterion weighs in favor of or against a finding of dilution. The court is next to view the findings under the criteria as a whole, i.e., "in the aggregate," *Zimmer*, 485 F.2d at 1305, giving due regard to the significance and strength of the finding under each subissue, to determine if the ultimate inference of dilution is permissible, and, if so, whether the evidence preponderates in its favor. *See Blacks United for Lasting Leadership, Inc. v. City of Shreveport*, 571 F.2d at 251.

[23] As we note in *Blacks United for Lasting Leadership, Inc. v. City of Shreveport*, 571 F.2d 248, 255 n. 6, (5th Cir.1978), dependent upon the nature of the scheme under attack, not all of the criteria may be relevant, and additional factors may have probative force. Notwithstanding, the multifactor test established in *Zimmer* is the touchstone in dilution cases, and the trial judge must look to it for guidance in determining what subissues may be appropriate.

*Nevett* at 226. The difficulty arises in "giving due regard to the significance and strength of the finding under each subissue." It is clear that all of the factors do not need to be proved in order for the plaintiff to prevail. *Zimmer* at 1305. It is similarly obvious that the "primary" factors, due to their close correlation with the ultimate issue of denial of minority access to the electoral process, are due more weight than the "enhancing" factors, which are facially race neutral. Beyond these guiding principles, the district court is apparently on its own in deciding if the "aggregate" of the criteria or the "totality

of circumstances" dictates a finding of vote dilution. This court will, therefore, examine the above "results test" factors seriatim, making findings with regard to each factor if possible, and then weigh the factors "in the aggregate" or in the "totality of circumstances" in order to determine if there has been a Voting Rights Act violation.

## FINDINGS OF FACT

Since 1946, Jasper has been governed by a City Commission consisting of three members elected by the voters of the city at large. On June 23, 1981, the electorate of the city voted to change its form of government to the mayor-alderman form. After the June 23 election, an action was filed in state court seeking a declaratory judgment as to when the officers under the new form were to be elected and to take office. For a history of this litigation, *see City of Jasper v. Daugherty*, 424 So.2d 615 (Ala.1982). The Supreme Court of Alabama held that the election of the new city officials is to be held on the second Tuesday in July 1984, with the new officials to take office under the new form on October 1, 1984.[2]

This action was commenced on August 31, 1982, prior to the decision of the Supreme Court of Alabama. The action has been certified as a class action. Plaintiffs represent all the black citizens of Jasper. The plaintiffs prayed that the court direct the holding of an immediate special election, that the city be districted, and that aldermen be elected from and by districts.

Unlike the "voluminous" evidence in *Nevett v. Sides, supra*, the evidence in this case was sketchy and skimpy.[3] No expert testimony has been offered to assist the court in its analysis of the limited evidence. The court will first make findings of the underlying facts and then relate these findings to the *Zimmer* criteria.

### Underlying Facts

Since the Commission form of government was established in 1946, there have been two black candidates for the City Commission. James B. Vincent was a candidate for Commissioner in 1972 and received 318 votes. Other candidates received 1,062 and 93 votes, respectively. L.D. Thomas was a Commissioner in 1979 and received 322 votes. Other candidates received 413, 325, 507, 447 and 79 votes, respectively. Neither Vincent nor Thomas was elected.[4] Of course, there is no history of candidacy or elections under the recently adopted mayor-alderman form.

Jasper has a population of 11,894. It has 1,971 black citizens. The voting population of Jasper is 8,802 of which 1,496 are black. There was no evidence that black citizens in Jasper have ever been denied the right to vote. There was no evidence that any black citizen has ever been harassed or intimidated during the voting process. While the court might assume that, at some point in history, black citizens were discouraged by poll taxes and other means from registering, several of the black witnesses testified that they voted up to 30 years ago without difficulty. There was certainly no evidence that black citizens in Jasper have had as much difficulty in voting as has been experienced by black citizens in some Southern communities. All voting registration is administered by Walker County of which Jasper is the county seat. In recent years deputy registrars, including black citizens, have been appointed to conduct home registrations. All black and white voters in the community vote at one central location, the City Auditorium. There was no evidence that all black voters vote at the same boxes.

Prior to about 1969 all black children in Jasper attended county schools which were located outside the city limits of Jasper.

---

**2.** The Commission form remains effective until October 1, 1984.

**3.** While the court discouraged plaintiffs from sermonizing in a general way about undisputed Constitutional principles and seeking comments as to whether plaintiffs subscribed to these prin-

ciples, the court made it plain that plaintiffs would not be limited in their presentation of actual evidence.

**4.** There is no evidence that there have ever, in the history of Jasper, been other black candidates for municipal office.

During the period prior to 1969, Jasper's white children attended public schools located within the city limits. While it is arguable that Jasper has never operated a "dual" school system, the court finds that such an argument is meaningless in that *no* black children attended Jasper schools of any type prior to 1969. Prior to 1969, the facilities for city black students in the county system were inferior to those of the white students in the city system. The members of the City Board of Education are appointed by the City Commission. There are no black members. The city school system has 62 teachers. Eight of these teachers are black. Eighteen and 04/100 percent of the students are black. Most of the city's black citizens reside in the southerly and southwesterly portions of the city in one generally contiguous area which could be reasonably included in one voting district.

All recreational facilities in Jasper are open to both black and white citizens. One of the main recreational sites is located in an area in which predominantly black citizens reside. The other primary recreational site (Memorial Park) is outside the area in which predominantly black citizens reside. Memorial Park is in the northwesterly part of the city and is included in a large area in which a city school and other public facilities are located. There are a number of neighborhoods in which predominantly white citizens reside which are also approximately the same distance from this park as the predominantly black neighborhood. The plaintiffs' attempted ascription of the principal park as being a "white" park is partly subjective. The court notes no substantial differences in the facilities of the two recreational sites which cannot be reasonably attributed to the one park being the principal city park. Other than the findings of the Secretary of the Treasury, there is no credible evidence that the city is non-responsive to the equipping and maintenance of the site in the black neighbor-

hood.[5] Except for evidence relating to Municipal Park there was no evidence that predominantly white neighborhoods, non-adjacent to Memorial Park, have recreational facilities superior to those in the black neighborhood.[6] The Park & Recreation Department has had a black member for over ten years.

The plaintiffs' complaints and evidence concerning non-responsiveness to black neighborhood needs is fairly summarized in Plaintiffs' Exhibit 4. The findings of the Secretary of the Treasury in said exhibit are reasonably supported by the evidence in this case and, except as hereinafter stated, the court adopts said findings.

The Secretary of the Treasury found some evidence of racial disparity in two subject areas. The Secretary found that the street assessment program of the city impacted more severely on black citizens and resulted in a disparity in paved streets. While the Secretary placed some emphasis on amounts assessed for over 24 years which had been written off by the city, the court does not find the amounts to be of great significance. The amounts written off were relatively small and were all on debts in excess of 20 years old. Under Alabama law, such assessments would be uncollectible. While it is appropriate that revenue sharing funds be used to relieve the disparity, the court does not find that assessments for street improvements by the City had its genesis in racial discrimination or that there was discrimination in the application of the assessment policy. Since the findings and recommendations of the Secretary were made, street improvements have been made in the black community.

There is some support for the finding of the Secretary that maintenance of recreational facilities at Memorial Park has been better than that at the black neighborhood recreational site. This is partially explained by misuse of the facilities. There has also been an effort to correct any such disparity.

---

**5.** See later discussion with regard to findings of the Secretary of Treasury.

**6.** In referring to "black" and "white" neighborhoods, the court is generally using the same

terminology as used by the parties. The reference is to neighborhood areas where the vast majority of the residents are of one of the two races.

The City Housing Authority has had black members for a number of years. The racial makeup of the public housing developments is as follows:

1. Blanton—14 units—⅓ of occupants are black;
2. Bankhead—all occupants are white;
3. Massey—59 of 150 occupants are black;
4. Carver—24 units—all black;
5. Western Elderly Project—all white;
6. Haley—13 black residents and 29 white residents;
7. Eastern Elderly Unit—3 blacks and 47 whites.

Thirty-Four percent of the total public housing occupants are black. Sixteen and 09/100 percent of Jasper's citizens are black. There was no evidence of any racial disparities in public housing.

In about 1974, Jasper was allocated $1,400,000.00 in Community Development Program funds to be expended in steps over a period of five years. At least 40% of these funds were expended on various projects in the predominantly black neighborhoods. The substantially larger portion of the remaining funds were expended on downtown projects.

There was no substantial evidence that in the last fifteen years the city has had a history of discrimination in employment. This finding is based primarily on a lack of evidence.

### Ultimate Facts

The court makes the following ultimate findings of fact pursuant to *Zimmer* and the added factors suggested by the legislative history of the amendment to Section 2.

### Primary Factors

1. Lack of minority access to the process of slating candidates.

There is no substantial evidence of any lack of access to the process of slating candidates for city elections or, indeed, that there has been such slating. Neither has there been any evidence that black citizens have been hindered in qualifying as candidates, campaigning or voting.

2. Unresponsiveness to particularized interests.

There has been no substantial evidence which would support a claim of unresponsiveness. While there may be evidence of isolated incidents of specific requests not receiving immediate attention, said inattention appears more typical of a municipality being financially unable to immediately react to all its citizens' perceived needs, rather than being based on race. Jasper's officials appear to have taken a progressive, non-racial approach to city management. There was no evidence of an appeal by candidates for city offices based on racial prejudice. There was no evidence that the majority is exploiting their political status to the detriment of the minority. The court finds no evidence that there is a lack of concern for the needs of the black community. The contrary appears indicated. There was no substantial evidence of public funds being expended for the primary advantage of the majority. The contrary may be indicated. While it may be appropriate that revenue sharing funds be used to avoid the necessity of assessments for public improvements, there is no indication that the street assessment program was conceived or administered with a racial bias. Both the evidence and the lack of evidence require a finding that there is no state of "unresponsiveness." [7]

3. Preference for at-large districting.

The incoming Board of Aldermen will have the option, under state law, to provide by appropriate ordinance or resolution that at succeeding elections, aldermen be elected from numbered districts. In view of this option there is no apparent state policy, "tenuous" or otherwise, preferring at-

---

7. One black citizen who testified, Underwood, appears to have a particularly strong voice at City Hall. There was no indication that City Hall has not objectively considered his concerns.

The court announced at the conclusion of the trial that there appeared to be no substantial evidence of "unresponsiveness." Reflection has not changed this impression.

large voting. *See Nevett v. Sides, supra,* 571 F.2d at 230.

4. Effect of past discrimination.

There was no direct evidence of past discrimination in the Jasper political system. If the court assumes that there has been such past discrimination, there is no substantial evidence that it precludes effective minority participation in the election system. The fact that, in two widely separated elections under a different form of government, two black candidates have not been elected, does not establish such a preclusion by a preponderance of the evidence. Whatever factors *may* have contributed to the defeat of these candidates, the court cannot attribute it to a preclusion of minority participation.

### Enhancing Factors

1. Existence of large districts.

There being at-large voting by the whole city, there is obviously only one large district.

2. Existence of anti-single shot voting provisions.

The following finding from *Nevett, supra,* appears appropriate:

> There is no anti-single shot voting provision since candidates run for numbered positions. The numbered position approach does have some of the same consequences however as an anti-single shot, multi-member race; because a cohesive minority is unable to concentrate its votes on a single candidate. The numbered position approach does, however, eliminate the problem caused when a minority group is unable to field enough candidates in anti-single shot, multi-member races.

571 F.2d at 230.

3. Majority vote requirements.

There is a majority vote requirement.

4. The lack of provision for at-large candidates running from particular geographic subdistricts.

There is presently a lack of such a provision. The court will consider the effect of this factor in its ultimate conclusion.

### Section 2 Legislative History Factors

As indicated the Section 2 amendment legislative history discusses three other factors, some of which overlap the *Zimmer* factors.

1. Polarized voting.

The evidence that each of the black candidates received a similar vote would tend to indicate polarized voting. There is no other evidence of polarized voting.

2. Overt or subtle racial appeals.

As indicated, there was no evidence of political campaigns being characterized by such appeals.

3. Consistent failure of minority candidates for public office.

The court cannot conclude that the failure of the minority to elect either of two candidates to three positions during a period of over thirty years can be considered a "consistent" failure to elect minority candidates. There has been no experience under the new system.

### *Final Conclusion*

The court will now weigh the above stated factors to determine if the criteria in the aggregate indicate a *racially motivated* dilution or a *resulting* denial of equal access to the political process. Of course, not all of the factors need be proved in order for plaintiffs to obtain relief.

It is significant that the plaintiffs have not proved any of the primary factors. The plaintiffs' failure to demonstrate a lack of access to the political process or an unresponsiveness to the minority interests weighs heavily against an inference of either intentional discrimination or a finding that the total circumstances of the electoral process have the *result* or effect of denying a racial minority an equal chance to participate in the electoral process. Even assuming that the state has a "tenuous" policy underlying a preference for "at-large" voting,[8] this alone would be insuffi-

---

8. As indicated, there is apparently no such long range policy.

cient to make out a case under *Zimmer.* *See Nevett, supra,* 571 F.2d at 229.

Although there is evidence of the existence of a large district, the existence of majority vote requirements and the lack of provision for at-large candidates running from particular geographical subdistricts, none of these findings are sufficient to overcome the statutory provision which specifically proscribes a determination that a protected class has a right to have members "elected in numbers equal to their proportion in the population." Although the court has given due consideration to legislative history, it cannot ignore the clear language of the statute.

A comparison of the evidence in this case to that in *Nevett* indicates that the plaintiffs' evidence in *Nevett,* although insufficient, was much more substantial than that presented by the plaintiffs here. In *Nevett,* the black citizens constituted a majority of the voters in some of the districts and slightly less than 50% of the voters for the city as a whole. The trial court found that voting rather strictly followed racial lines in a "winner take-all" election system; that there was an all-white governing body whose decisions "tended to reflect their own perspectives and the attitudes of those who elected them, to the relative detriment of the black minority, including such matters as appointments to other boards and agencies of the city." Further, after electing six members to the city council in 1968, the black citizens elected none in 1972. The trial court concluded, after applying the *Zimmer* factors, that no impermissible dilution of black voting existed under the Fairfield system. 571 F.2d 230–31. The Circuit Court affirmed. *Nevett* was a pre-*Bolden* case decided under standards similar to those that are now established by Section 2. The restraints of *Arlington Heights, supra,* and *Washington v. Davis, supra,* felt by the *Zimmer* and *Nevett* courts are not now applicable to a Section 2 case. However, the Section 2 proviso against a right based solely on proportionate voting is now applicable.

Considering plaintiffs' evidence as attempting to prove a constitutional claim, it is clear that mere "disproportionate effects are not enough to invalidate an at-large plan ...." *Nevett, supra,* 571 F.2d at 222. Considering plaintiffs' evidence as attempting to establish a statutory claim, it tends to prove nothing except that members of the protected class have not been, in two elections held *before any* elections under the new form of government, "elected in numbers equal to their proportion in the population." This is a case in which the only substantial evidence favorable to plaintiffs is that:

(1) Most black citizens live in a contiguous area which could be made a separate district. There is only one large district. Candidates are not required to reside in the district they will represent.

(2) In over 30 years under a *different* form of government, there have been two black candidates who were not elected to one of three positions.

(3) The election system requires a majority vote.

In the absence of substantial evidence against the defendants on the other factors, a judgment in plaintiffs' favor on these factors alone would fly in the face of the statutory proviso "that nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." If Congress had intended that municipalities in all events be districted so as to allow for elections within such districts by protected groups it could have perhaps so provided. It did not do so.

The court finally concludes that plaintiffs' evidence is insufficient under both an intentional discrimination analysis and a *results* analysis. Judgment will be entered for the defendants.

An order in accordance with this Memorandum Opinion will be contemporaneously entered herewith.

Attachment

Evidence and Proposed Remedies

Jasper, Alabama

PART OF PLAINTIFF'S EXHIBIT 4

## I. *Unpaved Streets*

### A. Evidence:

It was alleged that the City of Jasper, Alabama, has failed to provide the black community with adequately paved streets.

The City of Jasper, Alabama, contends that the City applies an assessment policy for street paving pursuant to Alabama State Statutes. The assessment policy has been in effect since 1921 or earlier. Jasper City officials asserted that City streets have also been paved by other programs such as the WPA (*Work Progress Administration*), Community Development Block Grants, and Alabama State Gasoline Tax for street improvements. The investigation also disclosed that the City of Jasper expended revenue sharing funds in 1975 for a street resurfacing project.

An analysis of the available evidence and the on-site investigation disclosed that there are approximately 3,600 residential dwellings in Jasper, Alabama, including approximately 552 or 15.3% black residential dwellings. An on-site tour of the unpaved streets in the City of Jasper, Alabama, disclosed that there are approximately 103 residential dwellings fronting on unpaved streets, including 74 or 71.8% black occupied residential dwellings and only 29 or 28.1% white occupied residential dwellings. Approximately 13% of all black occupied dwellings front on unpaved streets, while only 0.0095% of all white occupied dwellings front on unpaved streets. Black residential dwellings are located on the following unpaved streets.

| Street Name | From | To |
|---|---|---|
| Florida Avenue | Crutchfield | dead end |
| Birmingham | 29th Street | 27th Street |
| 28th Street | dead end | Gamble |
| 5th Street | 24th Street | dead end |
| unnamed | 31st St. South | dead end |
| 8th Street | 25th Street | 24th Street |
| 30th Street | 31st Street | dead end |

| Street Name | From | To |
|---|---|---|
| Walker Avenue | 33rd Street | 34th Street |
| unnamed | S. of 29th St. | (Frisco) |
| 10th Avenue | 27th Street | 25th Street |
| 23rd Street | at Coke Oven Road | |
| Highland Ave. | Railroad Track | 26th Street |
| 28th Street | Florida Ave. | Gamble |
| Gamble Avenue | 28th Street | dead end |

The investigation further shows that the City enforces the assessment policy; however, the policy is not strictly enforced for collecting assessment fees. The evidence shows that the City currently has charged off in 1978—$4,108.57; 1979—$2,690.82; 1980—$3,921.17 for property owners failing to pay assessment fees approximately 24 years old. The City's assessment policy has probably restrained black citizens from requesting the City to provide street paving service, since black families comprise 43.7% of the City's lower income families, and are less able to pay the assessed cost of street paving.

### B. Proposed Remedy:

Submit a plan to the Office of Revenue Sharing for approval which will ensure that street paving is provided on a substantially equal basis in the black and white residential neighborhoods. The plan should provide the specific dates when the work will begin and specific dates when the work will be substantially complete. It should also indicate the number and locations of black and white residential dwellings affected by the improvements and/or additions.

## II. *Sidewalks*

### A. Evidence:

It was alleged that the City of Jasper, Alabama, has failed to provide the black community with sidewalks.

There are approximately 209 residential dwellings in the City of Jasper which front on streets with sidewalks, including 34 or 16% black residential dwellings. The U.S. Census data shows that black dwellings comprise 552 or 15.3% of the total dwellings in the City of Jasper. Although only one street is identified as having a sidewalk in the black area, the number of black dwellings served reflects parity with the

total percentage (15.3%) of black dwellings in the City.

B. Proposed Remedy:

No Remedy Requested

### III. *Curbs and Gutters*

A. Evidence:

It was alleged that the City of Jasper, Alabama, has failed to provide the black community with curbs and gutters.

An analysis of the available evidence and on-site investigation disclosed that there are approximately 549 residential dwellings in the City of Jasper which front on a street or street segment with curbs and gutters. There are approximately 92 (16.8%) black dwellings fronting on a street or street segment with curbs and gutters, and approximately 457 (83.2%) white dwellings which front on a street or street segment with curbs and gutters. Black residential dwellings comprise 15.3% of the City's total dwellings. Thus, the number of black residential dwellings fronting streets with curbs and gutters reflect parity with the total percentage (15.3%) of black residential dwellings in the City of Jasper.

B. Proposed Remedy:

No Remedy Requested

### IV. *Drainage*

A. Evidence:

It was alleged that the City of Jasper, Alabama, has failed to provide the black community with adequate drainage.

On January 28, 1982, an on-site tour was conducted of the City's streets during the course of a heavy rainfall which lasted approximately 2½ hours. No flooding of open ditches or properties was observed; however, on some streets there was water in potholes.

An analysis of the available evidence (City Drainage Map) shows that the underground drainage system is located predominantly in the business sector of Jasper. The on-site investigation disclosed that Jasper's drainage system is composed mainly of open ditches in residential areas which drains into Town Creek and East Branch

Creek. The investigation also disclosed that a Housing and Urban Development fund grant was used to install drainage on Crutchfield Boulevard which is located in the black community. Since open ditches are the major drainage system in the City, there is no apparent disparity in the provision of drainage services.

B. Proposed Remedy:

No Remedy Requested

### V. *Sewer Service*

A. Evidence:

It was alleged that the City of Jasper, Alabama, has failed to provide the black community with sewer service.

The on-site investigation disclosed that the City does not provide sewer service. City Officials stated that sewer service is provided by an autonomous board, The Jasper Utilities Board. The City does not provide the board any financial assistance or services.

The Jasper Utilities Board took sewer service responsibility from the City in 1971. The Utilities Board must generate its operating funds from the services it provides for customers. Thus, customers are charged the full price for services provided.

B. Proposed Remedy:

No Remedy Requested

### VI. *Street Lights*

A. Evidence:

It was alleged that the City of Jasper, Alabama, has failed to provide the black community with adequate street lighting.

An analysis of the street lighting map shows street lights positioned on approximately each corner in the City. The evidence further shows that the City Manager approved each street light addition requested by Jasper residents. The Alabama Power Company confirmed the City's practice regarding the manner in which requested street lights have been installed in the City. The investigation also showed that the citizens are apparently aware of the procedure

in effect. Thus, no apparent disparity exists in the City's provision of street lights.

B. Proposed Remedy:

No Remedy Requested

VII. *Recreation*

A. Evidence:

It was alleged that the City of Jasper, Alabama, has failed to provide the black community with adequate maintenance of recreational facilities.

The available evidence and the on-site investigation shows that there are eight City operated recreational facilities in the white area and three City operated facilities in the black area.

City Officials stated that all City operated recreational facilities are open to all citizens of Jasper. The complainant and witnesses assert that all of the City's recreational facilities are indeed open to all citizens, but black citizens must travel longer distances if they wish to use recreational facilities located in white areas (pool and tennis courts).

The City of Jasper provided a list of equipment located at each facility. This list shows that the equipment is relatively similar at white and black recreational facility locations. The on-site tour of the recreational facilities disclosed a disparity in the manner in which the City maintains the changing and shower facilities at Memorial Park Pool in the white area and the Southside Pool in the black area. The Southside Pool's changing area has dirty floors, paint peeling off the floor, rust and/or stains in the commodes and face bowls, an entrance door which needs repairing, a water pipe protruding from the wall with a faucet for an additional shower, and shower stall partitions which are deteriorating. The Southside Pool's surface is cracked in several places and is in need of patching and painting. The conditions described above do not exist at Memorial Park Pool.

B. Proposed Remedy:

Submit a plan to the Office of Revenue Sharing for approval which will correct the maintenance conditions in the changing and shower facility, the repairing and painting of the surface of the Southside Pool, and will ensure that maintenance will be provided at all swimming pool facilities on a substantially equal basis.